of D.C. I'm here for Mr. Chappell now. Thank you, Your Honor. Representing Contender Farms, is that correct? Yes, Your Honor. Justin Chappell from Kano Gates. I represent the appellants, Contender Farms and Mike McGartland. And I'm joined with co-counsel Karen Cagle and David Broyles. Goodness. That's a lot of lawyers. Yes, it is, Your Honor. I don't think this really relates to the merits, but Contender Farms and its associated parties appear to be going to great effort to stop a regulation that apparently everybody agrees will never really affect them because you're righteous and you don't do soaring. Your Honor, we actually disagree with that. The conduct that is subject to the HPA is, in some cases, very objective. For example, a bilateral soaring violation is fairly clearly evident that that's occurred. But for much of the conduct covered by the HPA, the determinations as to whether or not the conduct has occurred, a scar rule violation or a foreign substances violation, for example, is highly subjective. So simply by participating in HIO-affiliated shows where DQPs are conducting the inspections and the conduct that they could be found in violation of is highly subjective, it is possible, in fact highly possible, that at some point during their competition, Contender Farms and Mike McGartland could be found in violation of one of those highly subjective violations. And in fact, the Super Bowl for Tennessee Walking Horse shows was last week at the celebration and 43 percent of entrants were cited in some way for a scar rule violation, whereas the year before, a scar rule violation, whereas last year the fail rate was approximately 5 percent. Is this under the new rule, is that what you're saying? It is under the new rule and candid to the court, these inspections were conducted by USDA, but the process that they used to determine soaring are the processes that they have required the HIO DQPs to impose on entrants in their shows. So the subjective process that the USDA follows itself has been imposed on HIOs, but they've been made mandatory. And so, whereas under the show that was held last week, if somebody was cited for a highly subjective process, it's that they have to prove that that violation occurred through the administrative hearing process in HPA 1825. If 43 percent of them were found to have violated, then that means they're all subject to being disqualified for a year, right? For a first time offender, it would be for two weeks. It ratchets up and eventually does reach one year, Your Honor. But if those same inspections were conducted by HIOs, and again, they're the same, it's the same inspection using the same standards, then Mike McGartland and Contender Farms would not be able to vindicate their due process rights through 1825. The suspension would be mandatory. They would have to start serving the suspension within 60 days. The appeal would have to be completed. They have none of the due process rights afforded to them in 1825, and it's further fleshed out in the agency's own administrative regulations. And quite simply, if the question is going to standing, there's no doubt that the rule, the direct objects of the rule, are people who compete in Tennessee walking horse shows such as the appellants. And that is the entire point of 1125C in the rule, is suspensions that apply to persons who compete in horse shows. Now if the USDA wanted to suspend someone who competes in a horse show, and it's a person that they want to suspend, that's 1825C, those due process protections attached. And so the injury that appellants complain of here is the deprivation of those due process protections simply by the agency deciding that it can delegate its enforcement authority to a private party. Now the source of that authority, the agency claims, is its general rulemaking authority in Section 1828. They have the authority to set requirements for horse inspectors for the purposes of furthering the Act in 1823, but those purposes are limited to diagnosing sore horses and keeping records and making reports to the USDA. 1828? Is the general rulemaking provision, Your Honor. Right. But why, it's limited, you said, to diagnosis and reporting, is that what you said? The general rulemaking authority itself is not limited to that. The agency does have general rulemaking authority as to the statute, but that general rulemaking authority is circumscribed by specific provisions of the HPA. 1823, in fact, is titled Disqualification of Horses, but in 1825, it's Disqualification of Offenders and provisions for providing that those offenders are suspended. So if the USDA does have general rulemaking authority as to the HPA as a whole, and we do argue in our brief that the issue is somewhat more complicated than that because here Congress is actually in specific statutory provisions cited to 1828, which would suggest that Congress intended the general rulemaking authority to apply to only specific provisions in 1824. But even if that were not the case, the agency just cannot, because it believes a particular action will further its policy goals, take its general rulemaking authority that normally would apply to setting requirements for the licensing of horse inspectors and the disqualifications of horses, and transmute that into a general authorization to suspend persons through those same horse inspectors. That authority is expressly delimited in 1825C, and that authority by Congress was reserved to the USDA. No, it seems to me there's a simpler argument, well, I mean, maybe you're sort of making this, but I don't think I've heard it yet, which is that 1820, I mean, it really does turn on 1828, because all that 1825 says is that they have the authority to designate the qualifications for the DQPs, right, and instead one of their explanations is they're using that authority to tell the HIOs what to do vis-a-vis violators, as opposed to simply the qualifications for a DQP. Yes, Your Honor, that's definitely another variation of the argument. I mean, that's just the plain textual, you know, conundrum in their argument with regard to 1825, it seems to me. Yes, we certainly do make that argument, Your Honor, and we also make the argument that in 1827, the HPA specifically delimits the USDA's ability to sub-delegate this authority to only officers and employees of the agency, and officers and employees of similar state agencies, and as a general matter of administrative law, as to delegations of agency authority or even of congressional authority, they have to be specifically made, and the presumption is actually against sub-delegations of government authority to private parties, unless it is expressly made in the statute, and even then, those are only permissible inasmuch as they authorize the private entities to conduct ministerial acts. So there's several different areas of the HPA that we can point to and say, whatever the government, whatever the limits of the government's authority are under its general rulemaking authority, there are the specific provisions that are applicable here limit the agency's authority in such a way that they cannot enact the regulatory scheme that they have proposed to in the rule. Well, now, one point that they . . . one thing that occurred to me while I was reading the briefs is, you know, they're arguing that the general sort of overcomes the specific limitations, which is the opposite of the specific usually controls over general, but . . . in interpretation, but then they cite FINRA and the . . . I think it's the SEC, the securities regulations, as having case law authority where, in fact, the courts have held that when the agency has broad rulemaking authority, it doesn't necessarily conflict with the narrower specification of their authority. Your Honor, they certainly cite those cases, but if you look at the statutory provisions in question, we also cite the FINRA statute, and we think that the difference in statutory detail alone is pretty telling. For the FINRA regulations, and there's also a great example in the Gentiva case that we cited in our supplemental brief that came down from the D.C. Circuit last year that involved Medicare enforcement, in statutes like that, the authority that is given, the delegation of adjudicatory authority that is given is expressly laid out in the statute. The FINRA statutes and the Medicare statutes are extremely detailed, and here we have a very simple provision, especially compared to other statutes that you see in administrative law, and there's just not that detail, and there's not that authority. Another thing that's important about the administrative law case is that they've cited where agencies do have regulatory or adjudicatory authority and have, in some sense, delegated that. It is usually to private parties that have a ministerial duty to collect fines or to just simply make a calculation, and in all of those cases, there's further review outside of the private entities that it's delegated to. So in Gentiva, in the Medicare context there, there was an initial determination made by a service provider. They had . . . the plaintiff there had the right to appeal to a Medicare Appeals Board. They had the right to take it into a federal district court and then review by the Court of Appeals, and it's something similar in the FINRA context, Your Honor. In the Sorrell case that was cited in the briefs, one of the reasons that the court there upheld the FINRA statute is because it preserved de novo review in a court, and we simply don't have that here. If the appellants are ticketed in a DQP proceeding, there is no judicial oversight. They have the ability to go through the appeals process established by the HIO, but there's no statutory provision that would permit the appellants to then challenge that ticket in a court of law or even before the agency. Is Contender Farms in any HIO? Is that the way it works? I thought that . . . No, Your Honor. Contender Farms is a small business that engages in breeding and showing horses. The HIO is simply, under the regulatory definition, is simply a group of people who are interested in showing horses. Now within that broad definition, there are HIOs who are in the business of getting licensing inspectors, and those are the HIOs that are involved here. Give me a name of an HIO, for instance. Show HIO was a plaintiff in the district court and did not join in the appeal and is currently undergoing decertification by the USDA. Does Show specialize in Tennessee walkers, or does it specialize in other kinds of horses? My familiarity with this case is that they were heavily involved in inspecting Tennessee walking horses. The HIO was specifically set up by the Celebration, which again is the Super Bowl of Tennessee walking horse shows, where there are hundreds, if not thousands, of individual entrants made. Show HIO was the only HIO that had the ability to conduct that number of inspections. In fact, Mike McGartland was the chief prosecutor for Show HIO for its private internal procedures prior to the enactment of the rule. Right. I remember seeing that. Going back to the standing arguments, if you look at the cases that are cited in the briefs, the cases that we rely on are much closer to the actual issue here. If you look at Lujan, Lujan is typically cited for the three elements of standing, but on page 572 and in note 7 of Lujan, the Supreme Court actually said that procedural rights are special and that the deprivation of procedural right actually lowers standing requirements as to immediacy and redressability. There are several precedents of this court that draw on that. The Bertulli case cited in our brief, for example, is a case that said that any view of standing that says that the plaintiffs have to suffer a tangible or monetary loss is too cramped a view of standing. It could be suffered through the deprivation of procedural rights. In that case, in fact, the court said that the plaintiffs who were complaining of the loss of seniority rights in a union proceeding, the plaintiffs couldn't show that they had actually suffered a monetary loss and that nonetheless, the court said they have standing to complain of the deprivation of procedural rights to a vote and to be part of a process and then they were denied that right. It's the same thing in the Roark case. Plaintiffs were targeted by a city ordinance. There was no doubt that the plaintiffs were the object of the ordinance and the city there didn't deny that there was the real potential of being subjected to those penalties that were incorporated into the city ordinance. If you look at the cases cited in the government's brief, they're simply an opposite here. They cite the Rivera case which was a products liability class action in which the class plaintiffs disavowed that they had even suffered any injury. There's the Allen case which was a tax exemption case and this is not a generalized grievance case that we are bringing but in Allen, the only way that the plaintiffs could have had a remedy was if the government withdrew a tax exemption. It turned on whether or not if that tax exemption were withdrawn that there were a significant number of discriminatory institutions in the plaintiff's neighborhoods that if that exemption were withdrawn, students would leave those schools and then would go to public schools and further the plaintiff's interest in integration and that was just too speculative. In the St. Francis case, the plaintiff tried to assert the injury of third parties that it didn't even have a geographic nexus with in a property case and in Central and Southwest Services, there was no showing that the plaintiffs there would even engage in the conduct that In that case specifically cited Friends of the Earth which is a case that's found standing because the plaintiffs said that in the future, they would go swim in a river that had been the subject of a pollution discharge. We're much closer, in fact we are in that realm of cases. We are the object of the rule and we do have standing. I reserve further time for rebuttal. Thanks a lot. Okay, Mr. Nemeroff. May it please the Court, Patrick Nemeroff on behalf of the United States Department of Agriculture. Now, I'd like to return back to the standing discussion that the panel was just engaging in but before I do that, I just want to put this regulation in context. In 1976, Congress amended the Horse Protection Act to address still pervasive soaring which is the practice where a horse trainer deliberately injures the front legs of a horse so that the pain actually causes the horse to adopt this desirable gait. And in order to address this problem, Congress did three things in this amendment. First, it expanded the scope of liability for soaring. Second, it expanded the USDA's enforcement authority. And third, it recognized an important role for a system of industry self-regulation in order to complement the USDA's enforcement authority. And under that system, horse shows can take advantage of a safe harbor provision in the act by hiring private inspectors from a horse industry organization or HIO that's USDA certified. For years before the regulation at issue here, those private inspectors would not allow sword horses to compete in shows, would report those sword horses. I really don't think that makes any difference. If your point is that they engaged in self-enforcement which was incentivized under the act, so what? Because now they're engaging in mandatory enforcement based on what the federal government tells them to do. They're simply not independent actors at this point in time, they are compelled. The relevance as to the plaintiff's argument is they say that the USDA has delegated some authority. But the reason it's important that these HIOs were already issuing these suspensions before the regulation is that it makes clear that the HIOs have the authority purely as a matter of their own private authority. They're not exercising any government authority in doing this. And so that's the important relevance. It's also relevant to the standing inquiry. And as Judge Godby started with the first question was, are these plaintiffs ever going to be subject to the suspensions under this regulation? And the fact is it's entirely speculative. The plaintiffs here disclaim ever soaring horses, they claim they never will soar horses in the future. They don't state that they've ever been accused of soaring in the past. And they give no reason to believe that they'll ever be falsely accused in the future. So at this point, it's entirely speculative that a private inspector ever will accuse them of soaring and that they'll be subject to any of the requirements that they complain of. Well, isn't there evidence that some of these determinations of soaring are somewhat, maybe not arbitrary, but subjective? That's right. Plaintiffs have alleged that some of the determinations are subjective, although they haven't put forth any statistical evidence of false accusations. But just that allegation alone is not sufficient. And there's a case that's very similar from the Sixth Circuit, White v. United States, where the court held that chicken breeders did not have standing to challenge the Animal Welfare Act, despite alleging that officers might confuse their chickens for fighting chickens because of their appearance, and might be likely to falsely prosecute them for that reason. And the court said that simply the possibility of that false prosecution based on a misunderstanding is not sufficient. Similarly here, whether or not the inspection may or may not be qualitative in nature, that doesn't give them standing. Well, but what it does suggest is that if there's a false positive, so to speak, under the regulation, they are doomed to have this internal review proceeding and lose the appeal appellate rights, including judicial review, that they would have otherwise had. Well, to be clear, before this regulation was in place, if a private HIO suspended an individual, that individual had no greater rights then than they do now under this regulation. Except for the fact that I infer that the HIO remedial scheme varied from HIO to HIO, and they were not necessarily as draconian as what's required now, which is if you find one horse soared, you disqualify the owner or the trainer or the rider or whatever, right? Well, a couple of things. They did have, there was variance in the suspensions that they issued. There was also variance in the appeals procedures that they issued. And what the USDA essentially did here was look out at the industry and identify the best practices that HIOs were engaging in, and said if you want to be a USDA certified HIO, then those are the practices you should adopt. Now, before the regulation, it certainly is possible that an HIO might issue the suspension and they would have the exact same or less of an appellate procedure. One thing that's clear is that even after the regulation, an HIO suspension is only a suspension from shows affiliated with that HIO or any other HIO that chooses to honor those suspensions. So it's very different from a USDA enforcement proceeding. When the USDA suspends a horse owner or a horse trainer, that horse owner and horse trainer can't compete in any shows, whether they're affiliated with a particular HIO or whether they're not affiliated with any HIO altogether. An HIO suspension, by contrast, is far more limited and is clearly, purely a private act. But of course, that goes to the statutory, whether the agency has statutory authority. So let me address that next. And here, the agency has authority to issue this regulation under two statutes, both read independently and together. Those are 1823C, which directs the USDA to prescribe the requirements for the appointment of these private inspectors, and 1828, which provides much broader authority to the agency to prescribe any regulation it deems necessary to carry out the provisions of the act. You don't contend that 1828 gives the agency the ability to amend the statute? That's right, Your Honor. It certainly doesn't. But isn't that the net bottom line of what you did? You did away with the administrative proceeding that guaranteed due process rights and judicial review because it was too hard, and in its place, put a private enforcement regime that has no due process guarantees, a very attenuated time frame, and no judicial review. It did not amend the statute in any way because the proceedings Your Honor is referring to are in 1825 and relate to the USDA's enforcement of the statute. So as I said, in 1976, Congress set these two parallel enforcement schemes. One is the USDA's enforcement, and the other is the private self-regulation. Wasn't the private self-regulation primarily a reporting mechanism where it was conceived that these guys would look? at every horse, they would look at every horse, and if they find evidence of soaring, then they refer it to the agency for prosecution? That was certainly part of it, and that was the requirement that was instituted in the initial regulations. But for quite a long while, the HIOs have also been engaging in these private suspensions. And they did those purely as a matter of private authority. And there's no reason? That was an ad hoc process that truly was up to them individually. Now we've got a mandated process coming from the government. Doesn't that kind of take it out of the realm of private bargaining? Well, it's still a private act. What that shows, the fact that they were able to do it before the regulation, is that they do not depend on any government authority to do it. And there's two other reasons why it's very clear that the HIOs are not exercising the USDA's enforcement authority under Section 1825 when they issue these suspensions. The first reason, as I alluded to earlier, is that an HIO suspension is significantly more limited in effect than a USDA suspension. So when an HIO suspends an individual from participating in shows for some period of time, two weeks, it only means that that individual cannot participate in shows affiliated with that HIO. The individual can still participate in any other shows that are occurring in the industry. By contrast, if the USDA suspends an individual... So there's no incentive for HIOs to find out whether an owner has been suspended by other HIOs because the fear is that somebody will report the second HIO to the Agriculture Department and they'll get penalized? There's no... The second HIO is under no obligation to enforce the suspension against the individual, so there is no such fear. It may not be under an obligation, but if it doesn't enforce it, doesn't it run the risk of, like, an enhanced violation? The HIOs are not subject... There's no liability that could ever be enforced against an HIO under the Act. The liability attaches... If you disqualify it from being an HIO, that's a pretty big limitation. Sure, but the USDA can't disqualify an HIO under the current regulations because it hasn't honored a suspension issued by another HIO. Well, isn't there an incentive to a blacklist, is basically what I'm saying. I don't think so, Your Honor. I think an HIO issues a suspension, it can report that to the public. Other HIOs may choose to honor the suspension, and there are reasons why they would do so, because they may not want someone who has recently been found to soar horses to participate in their shows, but they're not required to, and that makes a real difference about the effect between an HIO suspension and a USDA enforcement action. The third big difference, of course, is that the severity of the penalties under the USDA enforcement action are much greater than the suspensions under the regulation. So just to take an example, for a single violation under the Horse Protection Act, the USDA, if it chooses to suspend that individual, must suspend them for at least one year, so one year or greater. And for any subsequent violation, it would be five years or greater. By contrast, for example, for a single soaring, so a soaring of one hoof on a horse, the initial suspension is 60 days, a second violation would be 120 days, and the third violation would be one year. So if it's 60 days, and the appeal process takes 60 days, then the appeal process is a total waste of time, because in the meantime, they've been suspended. That's not quite right, Your Honor. So the way the appeal process works is that the individual who's been suspended needs to start serving their suspension after 60 days, within 60 days. So during the appeal process, the HIO presumably would not enforce the suspension, but the appeal process needs to end by 60 days so that the suspension can then be served. And the reason that this was part of the regulation is that, once again, the USDA identified best appeal processes that worked the best. Some other HIOs before this regulation were allowing the appeal process to drag on for so long that the suspension essentially wasn't effective. And that was found in the 2010 Inspector General Report, which found that there was pervasive soaring still in the industry and identified some of these issues that the USDA was trying to address in this regulation. And so opposing counsel argues that 1828, although clearly a broad provision of authority, is somehow limited by these more specific provisions, and that's simply not the case. First of all, there are some references in 1824 that prescribe certain conduct as set out by the agency in 1828. But those merely set a floor on what the agency needs to write regulations to address. They certainly don't prescribe a ceiling. And there's a good reason why Congress would have put those provisions in 1824, which is that 1824 can address criminal conduct. Am I correct that you're not relying on, I guess you said it was 1823C that specifies that the USDA can identify the criteria for DQPs? We're relying on both, Your Honor. Well, then answer the observation that I posed to opposing counsel, because I don't see how the plain text of 1823C, which authorizes you to enforce the law on DQPs, enables you to tell HIOs what to do with the violators. Well, so 1823C, what it essentially gives the USDA authority to do is to prescribe the inspection system that must be in place in order... Now, come on. The statute says prescribe the qualifications for DQPs. Right, but that statute... It doesn't say describe the whole... It doesn't give you authority to recreate an entire inspection system. Well, two things, Your Honor. First of all, the statute is in order to create a safe harbor for these horse shows, and the statute simply doesn't work if all USDA can do is set forth the qualifications. It has to be able to do more in order to make sure that that private inspection system is functioning properly so that the show should actually get... Well, from 1976 to 1990 to 2013, I suppose, the system functioned without this rule. Well, and the USDA had prescribed far more than just qualifications for the private inspectors. So the USDA had prescribed requirements for the manner in which they conduct the inspections, and it also had prescribed reporting requirements. So it wasn't simply the qualifications. And whether it's under 1823C or 1828, it's clear that Congress did contemplate USDA having broad authority in this realm. That's true from the legislative history where Congress said that USDA should prescribe both the qualifications and the duties of these private inspectors. It's also simply clear from the language of 1828. And there are several cases in which courts have relied on similarly broad language to allow agencies to enact regulations that reach problems that may not have been clear when the statute was initially passed or that may not have been specifically addressed. So for example, in United Steelworkers of America out of the D.C. Circuit, and that's 647 F. 2nd 1189, OSHA had relied on a regulation that said that it shall prescribe rules and regulations as it deems necessary to carry out its responsibility to ensure safe places of employment. And it relied on that broad grant to create lead standards that, among other things, said that employers had to monitor employees' blood lead levels and stop them from working if they got too high and then compensate them for that time. And the employers had said, well, that conflicts with the injury compensation laws. But what the D.C. Circuit said was that the statute had given this broad authority to allow them to prescribe rules as necessary, and that's exactly what OSHA did. Donna, the exact same thing is true here. 1828 gives the USDA broad authority. The only restriction is that the regulation needs to be reasonably related to the purposes of the Act. But I think the point is that OSHA, the OSHA law, and correct me if I'm wrong, that the OSHA law is broad-led. It doesn't prescribe anything specific about workplaces except that it sets up an enforcement mechanism and an agency to provide for the safety of workplaces in very broad terms. So the whole conferral of authority to OSHA is a very broad one, pursuant to which the agency has almost unfettered rulemaking authority, whereas here Congress was pretty specific, and it was probably pretty specific, if I had to guess, because the Senators from the horsey states didn't want to ruin that. They wanted to protect the welfare of the animals, but they didn't want to ruin the horse business. Well, if I could actually direct Your Honor to another case. To be honest, I'm not entirely sure what Congress had said about lead specifically, but there is another case out of the D.C. Circuit, Cable Vision Systems Corporation, a much more recent case in 2011. And the site for that is 649F3695. And there, the Communications Act had prohibited behavior by vertically integrated cable companies to restrict content from other providers, and the Act specifically addressed satellite providers. Over and over again, it required the FCC to prescribe regulations related to satellite providers. Well, 20 years ago when the Act was passed, those were the providers that mattered, but now terrestrial providers are far more important. And the FCC issued a regulation to address terrestrial providers, which were not addressed in the statute. And what the D.C. Circuit said was, yes, that's within the FCC's broad authority, and that those specific references to satellite providers created only a floor on the FCC's regulatory authority, not a ceiling. So exactly the same here is true. The Horse Protection Act has directed the USDA to address certain specific requirements in its regulations, but it has nowhere set a ceiling on the USDA's authority under 1828. And here, where all the USDA has done is find the best practices with relation to something that these HIOs were already doing, and said, if you want to be USDA certified, you don't have to be USDA certified. You know, this is a variation on we're the government, and we're here to help you, because what you're calling best practices is what contender farms say are onerous practices. In other words, the whole point of your regulation was to tighten up the regulation vis-a-vis the owners and breeders and showers of these horses, right? That's right, Your Honor. All right. So it's not best practices in the sense of ameliorative for the regulated people. It's tougher on the regulated people. Well, but just to be clear, the plaintiffs here have not raised on appeal any arbitrary and capricious challenge. So USDA's judgment that these are best practices is not what's at issue here. The only thing that's at issue is whether the USDA has statutory authority. And of course, under Chevron, the USDA is entitled to deference. It has a broad statute authorizing it to do this. And it's simply regulating something that the private parties were already doing as a matter of their own private authority. Thank you. And unless there are any other questions . . . Okay, Mr. Nauert. Thank you very much. Mr. Chappell, we'll hear from you. Your Honor, I want to pick up where opposing counsel left off with the cable vision case. The interpretation of that case that has been advanced by the government is really just a variation on the theme that the D.C. Circuit has made clear over and over again is impermissible for an agency to take. And that's that if the statute doesn't contain prohibitory language and the agency has broad rulemaking authority . . . It's a little knob down here. Go ahead. Go ahead. Thank you, Your Honor. It says . . . Go ahead. Go ahead. But the theme advanced from cable vision is that there's no ceiling on the authority in the HPA. Well, that runs headlong into the idea that an agency does not have the authority to act just if the statute doesn't speak in thou shalt not terms. And that's the lesson from the National Mediation Board case and in several other cases. Something else about cable vision is, going back to standing, is cable vision said that facial challenges like that appellants bring here are presumptively reviewable if they present purely legal questions. And there's no need for further factual development. And that's absolutely the case here. I also want to address the government's assertion that the manner in which HIO suspensions are served under the rule are different than those served under the HPA. That assertion comes from an interpretive letter that was put out by the USDA after we filed this lawsuit. And the government insists in its brief that that interpretive letter is entitled to deference under Auer v. Robbins. And that is simply not the case. 1125 parrots the language in 1825 of the HPA. That language is parroted in the rule in 1125. And under Gonzales v. Oregon, when you have a regulation that parrots the statute, the government's, the agency's interpretation of that regulation is not entitled to deference under Auer v. Robbins. It's entitled to the interpretation that Congress intended that it have and that the agency would take with respect to the statute. And if the government's position is that the Horse Protection Act would forbid a participant from showing any horse, and there's other language, but the keywords are any horse, and that language is also used, the exact same language in the regulation, then the scope of the regulation is coextensive with that of the statute. So there's simply no basis for any deference to the agency's determination that HIO suspensions under the rule are somehow different than the type of suspension that they would serve under the Horse Protection Act. They are one and the same. And they're very expansive. The government also proposed to give context to the Horse Protection Act's enactment in 1976. Well, what's interesting is that the regulations for the 1976 amendments came out three years later in 1979, and the agency proposed to have DQPs assert some of the authority that they do now under the rule, and the agency decided not to enact regulations vesting DQPs with that authority because they thought that it was inconsistent with the role for DQPs under the statute. And yet, 35 years later, the government has decided that DQPs have really had this authority all along, even though the HPA itself has not been amended since 1976. So the agency's position today with respect to the rule is actually directly contrary to the position that it took in 1979. What's your authority for that? That's the agency's discussion in the Federal Register pertaining to the 1979, the 1976 amendments. The regulations were promulgated in 1979. And that is cited in our brief. Right. The government also asserts that it has the authority under the HPA because what it is proposed doing is reasonably related to furthering the purposes of the Act. And again, just because a particular agency action might further the purposes of the statute or might even be good policy or might be a more effective way of doing things, they are expressly limited by the authority that Congress has put out for them in the statute. And in this case, the government's authority is cabined. If it wants to suspend a person, it has to do so itself under 1825. It has to provide the due process protections there. And it cannot just delegate to a private party that's responsible for licensing horse inspectors the responsibility for effectuating its goals and its responsibilities under the Horse Protection Act. Okay. Thank you very much, Mr. Chapman. Thank you, Your Honors.